985 So.2d 1133 (2008)
KIA MOTORS AMERICA CORPORATION, Appellant,
v.
Yvonne BUTLER, individually and on behalf of all others similarly situated, Appellees.
No. 3D05-1145.
District Court of Appeal of Florida, Third District.
June 11, 2008.
*1134 DLA Piper Rudnick Gray Cary U.S. LLP, and Fredrick H.L. McClure, Christina M. Burden and E. Colin Thompson, Tampa, for appellant.
Shepherd Finkelman Miller & Shah, LLC, and Scott R. Shepherd and Natalie Finkelman Bennett, Weston; Donovan Searles, LLC and Michael D. Donovan, Philadelphia, PA, for appellees.
Before SHEPHERD, SUAREZ, and ROTHENBERG, JJ.
SHEPHERD, J.
We have for review a trial court order approving the prosecution of a "premature wear" class action, brought by the plaintiff, Yvonne Butler, on behalf of all Florida purchasers of 1999-2001 Kia Motors America Corporation Sephia model passenger motor vehicles. The central contention of the class action complaint is that all Kia Sephias manufactured in those years contain a brake system design defect that causes premature wear of the front brakes, as a result of which the vehicles fail to meet a U.S. market brake-wear expectation of 20,000-30,000 miles. According to the complaint, the deficiency "[can cause] the Sephia vehicle to be unable to stop, suffer an impaired stopping performance, exhibit increased stopping distances, brake shudder, brake vibration, unpredictable and violent brake pedal pressures, brake lock up, and loss of control when activated, all of which diminishes [sic] the Sephia vehicle's value."
The plaintiffs seek an award of damages to each class member for economic losses, including the difference between the price paid for each vehicle and the value of the vehicle as delivered, depressed resale value, out-of-pocket repair costs, and expected future costs of repair. Ms. Butler, through her counsel, envisions an individual award to each member of the class, whether or not the alleged deficiency manifested itself in a particular case. Reviewing the certification order on an abuse of discretion standard, see Engle v. Liggett *1135 Group, Inc., 945 So.2d 1246, 1267 (Fla. 2006); Allstate Indem. Co. v. De La Rosa, 800 So.2d 245, 246 (Fla. 3d DCA 2001), we conclude the trial court abused its discretion in certifying a class in this case.

I. Factual Background and Procedural History
The trial court has defined the class in this case as "all persons who purchased and/or leased Kia Sephia automobiles in the State of Florida within four (4) years preceding the filing of this action...." The class includes all purchasers and lessees of 1999, 2000, and 2001 model-year Kia Sephias. There were approximately 17,928 Sephia vehicles sold or leased in the state during the period: 308 1999 model-year vehicles; 10,573 2000 model-year vehicles; and 7047 2001 model-year vehicles.[1] One of the 2000 model-year Sephias was sold to Yvonne Butler, the class representative in this case. Her story is said to be typical of the experience of the class members in this case.
Ms. Butler purchased her vehicle from Maroone Kia of Hollywood, Florida in October 2000. She paid approximately $10,000 for her Sephia. The vehicle was delivered with a standard thirty-six months/36,000 mile glove box warranty.[2] Ms. Butler first returned to Maroone Kia with her vehicle six months after purchase. She complained that her front brakes exhibited a "squealing noise" when applied. Maroone Kia responded by replacing the rotors on her vehicle's front brakes under warranty. Ten months later, she returned to Maroone Kia for front brake problems. The repair record for that visit reflects a complaint of vibration or "pulsation" of the front brakes on application. The rotors on her front brakes again were replaced and new brake pads were installed. Although the vehicle was still under warranty, Ms. Butler was required to pay for the repairs on this occasion. She thereafter had brake repairs done at a third-party service station on at least one additional occasion, in January or February 2003, and once again at the selling dealership one month after her warranty period expired. On her final dealership visit, Ms. Butler complained of a "loud grinding noise" emanating from the front of the vehicle upon application of her brakes. Kia Maroone technicians diagnosed a broken front leftaxle boot, and worn rotors and brake pads. The front brake rotors and pads again were replaced at her expense. There is no record of work on the broken axle boot.
The class action complaint was filed by Ms. Butler just before her last dealership visit. The legal theories under which she sought to proceed are the Magnuson Moss Warranty Improvement Act (MMWA), 15 U.S.C. § 2301-2312 (1975); the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), §§ 501.201-.213, Fla. Stat. (2003); breach of implied warranty; and breach of express warranty.

II. Analysis
Class actions are an exception to the general rule that litigation is conducted by, *1136 and on behalf of, individual named parties only. For that reason, the trial court must conduct a rigorous analysis to determine whether the elements of the class action rule, Florida Rule of Civil Procedure 1.220, have been met. Baptist Hosp. of Miami v. Demario, 661 So.2d 319, 321 (Fla. 3d DCA 1995). In so doing, the trial court first must find that the threshold requirements, found in Florida Rule of Civil Procedure 1.220(a), are satisfied. These requirements are:
(1) the members of the class are so numerous that separate joinder of each member is impracticable, (2) the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class, (3) the claim or defense of the representative party is typical of the claim or defense of each member of the class, and (4) the representative party can fairly and adequately protect and represent the interests of each member of the class.
Fla. R. Civ. P. 1.220(a). Commonly, these requirements are referred to as "the numerosity, commonality, typicality, and adequacy of representation elements of class certification." Marco Island Civic Ass'n v. Mazzini, 805 So.2d 928, 930 (Fla. 2d DCA 2001).
In addition to satisfying Rule 1.220(a), a plaintiff also must satisfy one of the three subdivisions of Florida Rule of Civil Procedure 1.220(b). The relevant subdivision in this case is subsection (b)(3). Florida Rule of Civil Procedure 1.220(b)(3) requires that common questions of law or fact predominate over any individual questions of the separate members, and that class representation is superior to other available methods for the fair and efficient adjudication of the controversy. The class certification in this case reversibly fails to satisfy these two criteria.[3]

A. The Predominance Inquiry
On this inquiry, we begin by reminding ourselves of the widely followed practical guidance to resolution of Rule 1.220(b)(3) controversies in class action appeals in this state, found in the Second District Court of Appeal decision, Humana, Inc. v. Castillo, 728 So.2d 261, 266 (Fla. 2d DCA 1999), review dismissed by 741 So.2d 1134 (Fla.1999). In that case, the court stated:
To certify a class, [R]ule 1.220(b) requires not only that common questions exist, but that those common questions predominate over individual questions. Rule 1.220 also requires a class action to be manageable and superior to other proceedings. To determine if the requirements of Rule 1.220 have been met, a trial court must envision how a class action trial would proceed.
Under this analysis, the trial court must determine whether the purported class representatives can prove their own individual cases and, by so doing, necessarily prove the cases for each one of the thousands of other members of the class. If they cannot, a class should not be certified.
*1137 Id.; accord Rollins, Inc. v. Butland, 951 So.2d 860, 870 (Fla. 2d DCA 2006); Atlanta Cas. Co. v. Open MRI of Pinellas, Inc., 911 So.2d 135, 138 (Fla. 2d DCA 2005); Bouchard Transp. Co. v. Updegraff, 807 So.2d 768, 771 (Fla. 2d DCA 2002); see also State Farm Mut. Auto. Ins. Co. v. Kendrick, 822 So.2d 516, 517 (Fla. 3d DCA 2002) (reversing an order certifying a class of Florida insureds on the ground that "[n]o `common right of recovery based on the same essential facts,' has been demonstrated") (quoting Colonial Penn Ins. Co. v. Magnetic Imaging Sys. I, Ltd., 694 So.2d 852, 853 (Fla. 3d DCA 1997)); Stone v. CompuServe Interactive Servs., Inc., 804 So.2d 383, 388 (Fla. 4th DCA 2001) (affirming trial court's denial of class certification in customer rebate case where "[e]ach rebate applicant's rebate history is unique"); Execu-Tech Bus. Sys., Inc. v. Appleton Papers Inc., 743 So.2d 19, 20-21 (Fla. 4th DCA 1999) (affirming trial court's denial of class certification where the plaintiff was unable to prove damages "through generalized, class-wide proof"). Applying this analysis to the instant case, we find that proof by Ms. Butler of any deficiencies in her vehicle will not advance the cause of class-wide relief for any of the thousands of other class members.

1. Common Questions of Fact
Ms. Butler has sought to portray the class as a large, unified group that has suffered a uniform, collective injury. In certifying the class in this case, the trial court accepted Ms. Butler's formulation, stating, "whether there was a defect and whether Kia is responsible for that purported defect, ... is a common question...." The evidence, however, demonstrates that the brake systems found in the three Kia Sephia models in this case are far from uniform.
The disc braking process in an automobile  the process involved here  is a complicated mechanical and hydraulically assisted process, wherein force applied to a brake pedal is enhanced and quickly transferred to brake pads surrounding a rotating "rotor" in the wheel well of the vehicle, squeezing the rotor and, in turn, slowing and stopping the tire and wheel. The Kia Sephia vehicle disc brakes installed during the model years at issue were comprised of component parts specific to that model year. In some instances, there were component changes during the course of the model year. During 1999 model-year production, the pad material was changed, the pad shim material was changed, the pad shim protector was removed, and rotor material modified. The 2000 model Sephia was manufactured with a different brake pad from the prior model. Additionally, the rotor thickness was changed. For the 2001 model-year, the Sephia's front brake system was completely redesigned. Unlike prior years, the component parts utilized on this model are not interchangeable with the parts used on earlier models.
The expert testimony presented both by Ms. Butler and Kia showed that changes of this type in the Kia braking systems can produce differing results in the field. The warranty repair rates for the three model years present strong evidence that this is precisely what occurred:

 Vehicles Vehicles Vehicles Vehicles Vehicles with
 with No with One with Two with Three Four or More
 Model Warranty Warranty Warranty Warranty Warranty
 Year Repairs Repair Repairs Repairs Repairs
 ---------------------------------------------------------------------
 1999 (22%) (41%) (20%) (8%) (9%)
 ---------------------------------------------------------------------
 2000 (77%) (16%) ( 4%) (1%) (1%)
 ---------------------------------------------------------------------
 2001 (91%) ( 8%) ( 1%) (0.20%) (0.06%)
 ---------------------------------------------------------------------

*1138 Warranty repair rates over the three model-year periods at issue in this case dropped from seventy-eight percent for the 1999 model-year to eight percent for the 2001 model-year.
As previously stated, this case seeks recovery for financial loss. Ms. Butler's core contention is that these model-year Kia Sephias contained an unacceptably high rate of noise, vibration, judder, pulsation, and brake pad life-wear deficiencies. Kia denies that any of these problems  to the extent they existed in their Sephia models during these years  were "defects." Kia points out that there is no absolute design for automobile front brakes.[4] According to Kia, brake design requires a balancing of design goals which are not consistent, including braking stability, brake response time, reliability, appropriate cost for the price of the vehicle, maintainability, rate of wear, noise, and corrosion resistance. Quality and performance tradeoffs, therefore, necessarily occur; the final judge being the marketplace, according to Kia.
Whatever the merits of Kia's "no defect" argument, it cannot be disputed that the component and design changes described above resulted in significant differences in the performance of the Kia Sephia's front brakes over the three model years at issue here. It is therefore scientifically and logically impossible to conclude that any performance issues for these three model years were the result of a common design. It follows that even if there existed a difference between the price paid for each vehicle and the value of the vehicle as delivered for any design period, that difference cannot be proven on a class-wide basis. See Ortiz v. Ford Motor Co., 909 So.2d 479, 481 (Fla. 3d DCA 2005). In fact, to proceed at the level of abstraction urged by Ms. Butler would raise due process concerns. See Grosso v. Fid. Nat'l Title Ins. Co., 983 So.2d 1165, ___ (Fla. 3d DCA 2008) (citing Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 377-78, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996)); Rollins, Inc., 951 So.2d at 874 (holding that proving allegations of deficient performance by pest control company of class of 65,000 purchasers of termite contract through "collective proof" would, "[b]y any standard ... amount to a violation of substantive due process of law"); see also Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998) (holding that a class action defendant might have been denied a fair trial where it was forced to defend against a "perfect plaintiff" pieced together for litigation); Stonebridge Life Ins. Co. v. Pitts, 236 S.W.3d 201, 205 (Tex.2007) ("[D]ue process requires that class actions not be used to diminish the substantive rights of any party to the litigation."); see generally Mark Moller, The Rule of Law Problem: Unconstitutional Class Actions and Options for Reform, 28 Harv. J.L. & Pub. Pol'y 855 (2005) (discussing how aggregation can alter rights of parties); Richard A. Epstein, Class Actions: Aggregation, Amplification, and Distortion, 2003 U. Chi. Legal F. 475 (2003); Markham R. Leventhal, Class Actions: Fundamentals of Certification Analysis, 72 Fla. B.J. 10, 15-16 (1998) (noting that where a class is certified improperly, the defendant is deprived of asserting all "substantive defenses" applicable to all class members and ultimately is deprived of due process).
There are two additional, readily apparent reasons why this case cannot proceed *1139 as a class action. One rests upon the fact that the class representative in this case seeks compensation not only for class members whose brakes have manifested a deficiency, but also for those whose brakes have performed satisfactorily. In certifying the class, the trial court deviated from the majority of jurisdictions, which consistently have denied class recovery on the type of theory the class representative presses in this case. See, e.g., Briehl v. Gen. Motors Corp., 172 F.3d 623, 628 (8th Cir.1999) (applying Mississippi, New York, Pennsylvania, and Texas law); Angus v. Shiley, Inc., 989 F.2d 142, 147-48 (3d Cir. 1993) (applying Pennsylvania law); Willett v. Baxter Int'l, Inc., 929 F.2d 1094, 1099-1100 (5th Cir.1991) (applying Louisiana law); Carlson v. Gen. Motors Corp., 883 F.2d 287, 298 (4th Cir.1989) (applying South Carolina law); Am. Suzuki Motor Corp. v. Super. Ct., 37 Cal.App.4th 1291, 44 Cal.Rptr.2d 526 (1995); Ford Motor Co. v. Rice, 726 So.2d 626, 627, 631 (Ala.1998); Yu v. IBM Corp., 314 Ill.App.3d 892, 247 Ill.Dec. 841, 732 N.E.2d 1173 (2000); Capital Holding Corp. v. Bailey, 873 S.W.2d 187, 192 (Ky.1994); Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J.1998); Barbarin v. Gen. Motors Corp., No. 84-0888, 1993 WL 765821 (D.D.C. Sept. 22, 1993); Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595 (S.D.N.Y.1982). Although we did so after the trial court certified the class in this case, we have firmly aligned ourselves with this majority jurisprudence. See Ortiz, 909 So.2d at 479.[5]
*1140 Finally, as conceded by Appellant, it is customary in the industry that car owners, for cost, convenience, or other reasons, elect to have their vehicles serviced by third-party vendors, as did Appellant herself in this case. Without individual inquiry, there is no way in adjudicating this case to determine whether the need for a particular repair was based on normal wear, a defective original part, a defective after market part, environmental factors, such as weather or road conditions, the presence of foreign objects in the braking system, the failure of parts other than the braking system, poor workmanship by a third party, or individual driving habits. Appellant's expert agreed in testimony supplied to the trial court that each of the brake problems at issue in this case can be, and often are, caused by these individualized conditions. For all of these reasons, it is clear that individual questions of fact predominate over common questions of fact in this case.

2. Common Questions of Law
We do not forget that Rule 1.220(b)(3) reads in alternative on this prong. Just as common questions of fact do not predominate in this case, we likewise are persuaded here  on parallel if not near identical reasoning  that common questions of law do not predominate. For example, it is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Rollins, Inc., 951 So.2d at 869 (citing Chicken Unlimited, Inc. v. Bockover, 374 So.2d 96, 97 (Fla. 2d DCA 1979)); Gen. Motors Acceptance Corp. v. Laesser, 718 So.2d 276, 277 (Fla. 4th DCA 1998); Macias v. HBC of Fla., Inc., 694 So.2d 88, 90 (Fla. 3d DCA 1997). The FDUPTA class claim fails in this case on both the causation and actual damages elements. Among the individual questions that can be reasonably envisioned in the prosecution of this count are: (1) whether the purchaser had knowledge of the alleged brake defect and purchased the vehicle despite such knowledge; (2) whether a deficiency attributable to Kia manifested itself; (3) whether an individual vehicle suffered diminished value as a result of the alleged deficiency if the deficiency was repaired; and (4) whether the purchase price of the vehicle reflected the alleged defect at the time it was purchased.
Additionally, as a matter of law, the class members cannot recover the full panoply of damages they seek under this count of the class complaint. Under section 501.211 of FDUPTA, see § 501.211(2), Fla. Stat., a successful claimant is entitled only to "actual damages." FDUPTA "actual damages" do not include consequential damages, such as repair damages or resale damages, both of which are sought by Ms. Butler on behalf of the class in this case. See Rollins, Inc., 951 So.2d at 869-70. Nor has Ms. Butler demonstrated she had developed or could develop a reasonable methodology for generalized proof of the damages that are arguably recoverable under FDUPTA. See Execu-Tech Bus. Sys., Inc., 743 So.2d at 20-21.
The breach of class-wide implied warranty and breach of express warranty claims fare no better, again, for the same reasons. See Amoroso v. Samuel Friedland Family Enters., 604 So.2d 827, 833 (Fla. 4th DCA 1992), aff'd, 630 So.2d 1067 (Fla.1994) (setting forth the elements of a claim for breach of implied warranty, including "[t]hat the product was defective when transferred from the warrantor" and "[t]hat the defect caused the injury"); McCraney v. Ford Motor Co., 282 So.2d 878, 878 (Fla. 1st DCA 1973) (stating that *1141 to recover for breach of express warranty, a plaintiff must prove both causal connection and damages). Because, as Ms. Butler acknowledges, the MMWA borrows Florida contract law for its standard, see Walsh v. Ford Motor Co., 807 F.2d 1000, 1016 (D.C.Cir.1986), the federal MMWA claim in this case likewise is flawed.
In these respects, this case is quite similar to our recent case, Volkswagen of Am., Inc. v. Sugarman, 909 So.2d 923 (Fla. 3d DCA 2005). In that case, the class plaintiffs sued Volkswagen and a local dealer, seeking financial damages for an alleged design defect wherein the front bumper assemblies of 1999-2002 model-year Volkswagen Jettas hooked onto the wheel stop or curb when the vehicles were parked, such that when the driver backed the Jetta out of the parking place, the retainers holding the front bumper assembly detached, causing damage from fifty dollars to $250. Id. at 924. We reversed an order certifying a class on the ground that "[the] predominance requirement is not satisfied when the claims involve factual determinations...." Id. We explained:
[W]e conclude that the trial court abused its discretion in certifying a class action because the key element of causation mandates individual inquiry into each plaintiff's claim. As to each parking accident, the trier of facts must determine specific vehicle conditions, the specific location and manner of the alleged damage, and the actions of the specific driver operating the vehicle. For example, such things as tire pressure, cargo and passenger load of the vehicle, and the condition, location and height of the wheel stop or curb alone would affect the clearance existing at the time of the alleged accident. Even though the damage to the vehicle's bumper assembly was a common issue raised by all purported class members, a series of minitrials would be required to determine the causation of each class member's particular claim of loss.
Id. Similarly here, individual inquiry would be necessary to determine liability and damages in the case of each class member.
In complex cases such as this, where no one set of operative facts establishes liability, where no single proximate cause applies to each defendant, and where individual issues outnumber common issues, trial courts should be hesitant to certify class actions. We find the trial court reversibly erred in applying the predominance criteria to the facts of this case.

B. The Superiority Inquiry
"[T]o find superiority, a court must find all other methods of resolving the issues in a case to be inferior to a class action." Sanneman, 191 F.R.D. at 455. Ms. Butler argues this case is an appropriate one for claim aggregation because there are multiple claims and the potential recovery of each class member  which she estimates to be $1000  is inadequate to justify the expense of individual litigation. Ms. Butler forgets, however, that fewer than half of the class members have reported brake difficulty. If the warranty claim reports are any indication (and they are the only indication), approximately 3225 of the 17,928 class members have experienced the alleged common deficiency in their vehicle.[6] For reasons already discussed, individual inquiry and an inestimable number of mini-trials will be necessary to identify the class. Just as in Sanneman  another automobile defect case in which class members *1142 sought recovery of economic losses for alleged defective paint deficiencies in eight model years of Chysler vehicles  we believe "[the] number of `mini-trials' would be imperative, the costs associated with a class action would be very high; [and] due to the necessary individual litigation ..., the cost savings [of class treatment] would not be marked." Id. Class certification is not ipso facto required where there exist multiple claims and potentially low dollar recovery.
The judgment we make on this inquiry is not just a difference of opinion with the trial judge. "Courts are hesitant to certify classes in litigation where individual use factors present themselves, such as cases involving allegedly defective motor vehicles and parts. The administrative burdens are frequently too unmanageable for a class action to make sense in such cases." Id. at 449. Our independent review of cases involving motor vehicles and component parts confirms this observation. See, e.g., In re: Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D.La. 1998); In re Ford Motor Co. Ignition Switch Prods. Litig., 174 F.R.D. 332 (D.N.J.1997); Barbarin, 1993 WL 765821, at *3; Chin, 182 F.R.D. at 448; In re Bridgestone, 288 F.3d at 1012.
Equally pertinent in our mind is the fact that in these types of cases, both the state and federal government have been vigilant to assure that vehicle owners who believe they have been sold an inferior product are not outgunned. See, e.g., Florida's Motor Vehicle Warranty Enforcement Act., ch. 681, Fla. Stat. (2007); Magnuson-Moss Warranty Improvement Act, 15 U.S.C. § 2301-12 (1975). The Florida law, known as the "Lemon Law," imposes strict time constraints on manufacturers to respond to complaints and for case resolution. § 681.104, Fla. Stat. (2007). Attorney fees are recoverable under both the MMWA and Lemon Law. See 15 U.S.C. § 2310; § 681.112, Fla. Stat. In addition, the National Highway Safety Act, 49 U.S.C. §§ 30101-30170 (2007), allows "[a]ny interested person" to file a petition with the National Highway Traffic Safety Administration (NHTSA) to initiate proceedings aimed at determining whether a government backed recall is appropriate. 49 U.S.C. § 30162(a)(2). A NHTSA recall would reach the "uninjured" class members in this case. This mechanism is clearly the superior "aggregate mechanism" if the goal is relief for the "uninjured." See Richard M. Goodman & Center for Auto Safety, 1 Automobile Design Liability § 1:9.1 (3d ed. 1994) (citing In re Bridgestone/Firestone, 288 F.3d at 1019 ("Regulation by the NHTSA, coupled with tort litigation by persons suffering physical injury, is far superior to a suit by millions of uninjured buyers for dealing with products that are said to be failure-prone.")).
We conclude that certification of a class here would not, as required, promote economies of time, effort, and resources. We are fortified in our conclusion by the fact  admitted by Ms. Butler in her complaint  that many Kia Sephia owners long ago achieved satisfaction through the less cumbersome individual mechanisms provided by state and federal law for these types of claims. We conclude the trial court abused its discretion in finding that the class mechanism is the superior mechanism of resolving the myriad factual and legal issues presented by this case.

III. Conclusion
The opportunity to adequately and vigorously present material defenses lies at the very core of the adversarial process. In this case, it is clear that individual issues predominate over common ones, and the class mechanism is not superior to other available avenues of relief. The trial court abused its discretion in certifying the *1143 class. For this reason, we reverse the order under review with the direction that the class be decertified.
Reversed and remanded with directions.
NOTES
[1] The Kia Sephia was renamed the Kia Spectra beginning with the 2002 model year. Although the "same basic car," according to Kia, this vehicle is not included in the class definition.
[2] Under this warranty, Kia warranted to Ms. Butler that "all components of your new Kia Vehicle" will be "free from defects in material or workmanship" for the term of the warranty. The warranty also contains several straightforward limitations and exclusions pursuant to which "[n]ormal wear, tear or deterioration," or damage due to "misuse of the ... Vehicle," "[l]ack of proper maintenance," "[a]ccidents," "[a]lteration, modification, tampering," "[d]amage or surface corrosion from the environment," and other factors beyond the control of the manufacturer, are excluded from coverage.
[3] Kia also asserts the trial court erred by concluding that Ms. Butler's claim satisfies the typicality requirement of Florida Rule of Civil Procedure 1.220(a)(3), and that she is an adequate representative of the class to prosecute the action under Florida Rule of Civil Procedure 1.220(a)(4). We disagree. The typicality requirement addresses only the sufficiency of the named plaintiff. See Weiss v. York Hosp., 745 F.2d 786, 810 (3d Cir.1984). The test is not demanding. See Sanneman v. Chrysler Corp., 191 F.R.D. 441, 447 (E.D.Pa. 2000). We conclude the trial court did not abuse its discretion in holding that Ms. Butler met this requirement. We find it unnecessary to address Kia's argument under Florida Rule of Civil Procedure 1.220(a)(4).
[4] The only regulatory obligation it had during those years was to meet Federal Motor Vehicle Safety Standards requiring that all vehicles sold in the United States ensure the vehicle stops within minimum stopping distances, which the Kia Sephia indisputably did.
[5] With characteristic lucidity, Judge Frank Easterbrook of the United States Court of Appeals for the Seventh Circuit explained in In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1017 (7th Cir.2002), why the majority rule is the correct rule. Explaining on review of two district court orders certifying nationwide classes, empowering more than three million vehicle owners to seek "risk of failure" and diminished vehicle resale value arising out of their operation of vehicles sporting Bridgestone/Firestone tires that never failed, Judge Easterbrook offered the following instructive example:

Defendant sells 1,000 widgets for $10,000 apiece. If 1% of the widgets fail as the result of an avoidable defect, and each injury creates a loss of $50,000, then the group will experience 10 failures, and the injured buyers will be entitled to $500,000 in tort damages. That is full compensation for the entire loss; a manufacturer should not spend more than $500,000 to make the widgets safer. See Bammerlin v. Navistar [Int'l Transp.] Corp., 30 F.3d 898, 902 (7th Cir. 1994); United States v. Carrol Towing Co., 159 F.2d 169, 172 (2d Cir. 1947) (L. Hand, J.). Suppose however, that uninjured buyers could collect damages on the theory that the risk of failure made each widget less valuable; had they known of the risk of injury, these buyers contend, they would have paid only $9,500 per widget-for the expected per-widget cost of injury is $500, and each buyer could have used the difference in price to purchase insurance (or to self-insure, bearing the risk in exchange for the lower price). On this theory the 990 uninjured buyers would collect a total of $495,000. The manufacturer's full outlay of $995,000 ($500,000 to the 10 injured buyers + $495,000 to the 990 uninjured buyers) would be nearly double the total loss created by the product's defect. This would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defects. A consistent system-$500 in damages to every buyer, or $50,000 in damages to every injured buyer-creates both the right compensation and the right incentives. A mixed system overcompensates buyers and leads to excess precautions.
Id. at n. 1 (emphasis added). Judge Easterbrook further stated, with regard to plaintiffs' claims for compensation for "diminished resale value":
Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold. Owners who wring the last possible mile out of the vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of publicity in 2000.
Id. at 1019. Judge Easterbrook's reasoning is particularly instructive in this case.
[6] Seventy-eight percent of the 308 1999-model-year class members (240) + twenty-three percent of the 10,573 2000 class members (2422) + eight percent of the 7047 2001 class members (564) = 3226.