SHEPHERD, J.
We have for review a non-final order approving the prosecution of a “coupon” class action by two classes of purchasers of Tire Kingdom automotive repair services — one class of statewide customers and the other a Miami-Dade County class — who either (1) “used or benefited” from a discount coupon that failed to disclose the store would add a “shop fee” to the discounted price advertised on the coupon or (2) were “overcharged” for a service at Tire Kingdom by the “imposition of a shop fee based upon a percentage of the retail price of the service, rather than the advertised or charged price,” in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), §§ 501.201-.213, Fla. Stat. (2006), the Florida Motor Vehicle Repair Act, §§ 559.901-.9241, Fla. Stat. (2006), and the Miami-Dade County Vehicle Repair Ordinance, §§ 8A-161.1-.37 Miami-Dade County Code.[1] Each of these enactments makes unfair or deceptive acts or practices unlawful.[2] The plaintiffs seek an award of damages to each class member in the amount of the full “shop charge” or “overcharge,” levied against each customer. We conclude the trial court abused its discretion in certifying the classes. A detailed summary of the record is necessary to explain our decision.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
A. The Class Representatives
There are two class representatives in this case, Aimee Dishkin and James Soper. *440 Both are practicing lawyers. Both are social acquaintances of plaintiffs’ counsel.[3] The particulars of each plaintiffs experience with Tire Kingdom are as follows.[4]
1. Aimee Dishkin
On July 17, 2006, Aimee Dishkin went to a Tire Kingdom store at 8495 S.W. 132nd Street in Miami, Florida, to obtain an oil change on her 1997 Jeep Wrangler. Dish-kin testified that prior to going to the store, she printed a coupon from the Tire Kingdom website, offering an oil change for $16.99, and presented it to the store at the time of service. The coupon did not mention shop fees, hazardous material disposal charge, or any other charge, including taxes. Tire Kingdom has no record of her presenting a coupon to the store, but the invoice provided to her upon completion of the service itemized the charges to her account as follows:

TIRE KINGDOM, INC.

* * * * INVOICE * * * *
Customer:
DISHKIN, AIMEE
Item Number Item Description_Price Extended
*OCB OIL CHG BULK OIL 16.99
Haz-Material Disp Ch PZ-34 Haz-Material Disp Charge 3.00
Special Credit: 5.00-
Total Charges.. 19.99
Total Credits ... 00
Sub-Total. 19.99
New Tire Fees* * .00
Shop Fees(*) 1.70
All Taxes. 1.52
Payments 23.21-
Net Amount.... 00
The asterisk next to “shop fees” directed Dishkin to the following explanation, clearly appearing at both the top and foot of the invoice: “ * CHARGE REPRESENTS COST/PROFIT TO THE VEHCILE REPAIR FACILITY MISC, SHOP SUPPLY OR WASTE DISP.”[5] Dishkin testified that while she “looked at” the invoice and signed it before paying for the service, it was not until that evening she reviewed the invoice further and noticed the shop fee charge. She did not call or complain to anyone about the charge. Instead, she joined as a plaintiff in the class action complaint filed in this case nine months later. The only deception she alleges in her complaint, for which she seeks recovery, is the shop fee charge appearing on *441 her invoice. The shop fee charge on her invoice was ten percent of the cost of the service.
Although the store patronized by Dish-kin had at least four signs prominently posted in the public area of the store-two affixed to the customer counter, one affixed to the wall in the same area, and a fourth perched on a stand in the customer waiting room-Dishkin stated she did not “specifically recall” seeing any of the signs. While it is company practice to have customers sign an estimate form before providing service, Dishkin testified she did not receive or sign a written estimate for the services she received in this case.
2. James Soper
On February 25, 2007, James Soper went to a Tire Kingdom store located at 3753 Bird Road in Coral Gables, Florida, for tire maintenance on his 2002 Land Rover. Soper testified that before going to the store, he printed a coupon from the Tire Kingdom website offering tire maintenance service (four-tire rotation, air pressure check, computerized spin balance and alignment check) for $19.99. The coupon applied to “Most Cars and Light Trucks.” The coupon did not mention shop fees, hazardous material disposal charge, or any other charge, including taxes.
In fact, Soper was not eligible to use the coupon because his vehicle was a Land Rover. When Soper arrived at the store, the salesperson at the customer service desk rejected the coupon. Soper then spoke with the store manager, Eduardo Alvarez, who gave him the discount anyway based upon a generic code entered into the computer. Alvarez testified he remembered Soper because Soper had called the store on the prior Thursday to ask whether he could use the coupon. Alvarez testified he told Soper that the coupon “did not apply,” but that if he came in, Alvarez would give him the discount anyway.
Soper paid $25.24 for the service he received. While eschewing the suggestion an estimate was presented prior to the beginning of his service,[6] Soper acknowledged signing one for the services he received. In the statutorily prescribed black bordered box[7] in the bottom left-hand corner of the estimate where Soper signed, there appears an “X” next to the line reading, “I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $25.24.” In the middle of the estimate, in an open area, appears the signature of “Eddy,” the name by which Eduardo Alva *442 rez was known in the store. The only record evidence of Alvarez being at the customer service desk, where these forms are prepared, during the course of Soper’s service, was when he approved the equivalent discount on Soper’s service before it commenced.
Adjacent to the black-bordered box in the bottom right-hand corner of the estimate appears the following itemization of anticipated services to be performed:

TIRE KINGDOM, INC.

Customer:
SOPER, JAMES
Item Number Item Description Price Extended
RNC ROTATION NO CHARGE ALL WHEEL
SBS STANDARD WHEEL BAL CO OS IO CO
mpto Tire Promotion 1- £>- 05 lO H
Special Credit:
35.96 Total Charges..
15.97-Total Credits..
19.99 Sub-Total.
.00 New Tire Fees* *
3.60 Shop Fees(*)
1.65 All Taxes.
25.24-Payments.
Net Amount... .00
As with the Dishkin invoice, the asterisk next to the phrase “shop fees” on the Soper estimate directed his attention to the statement, “ *CHARGE REPRESENTS COST/PROFIT TO THE VEHICLE REPAIR FACILITY MISC, SHOP SUPPLY OR WASTE DISP.” at the foot of the estimate.[8]
Soper also received an invoice for the services rendered him. There is no dispute this document was presented to him upon completion of the service. The invoice he received is identical in form to that received by Dishkin seven months earlier at a different store. The same itemized list of charges on Soper’s invoice also appears in his estimate, sans, of course, the advice “Do Not Pay from this Form.” An asterisk appearing after the phrase “Shop Fees” again directed Soper to the same explanation at the foot of the invoice, as appeared at the foot of his estimate, namely the “ *CHARGE REPRESENTS COST/PROFIT TO THE VEHICLE REPAIR FACILITY MISC, SHOP SUPPLY OR WASTE DISP.” Consistent with the estimate, the total invoice amount for the service provided to Soper was $25.24, the amount which he paid. The invoice amount included a shop fee charge of ten percent of the undiscounted retail price of the service.
Although the store patronized by Soper had three signs prominently posted in the *443 public area of the store — one affixed to the customer service counter, one affixed to a wall in the same area and a third perched on a stand in the customer waiting room— Soper testified he “did not recall” seeing any of the signs, despite the fact he ordered his service at the customer service counter and utilized the customer waiting room for about thirty minutes while his service was being performed. Like Dish-kin, Soper testified he did not notice the “shop fee” charge on the invoice until he got home that day, and did not complain to the store. Thirty days later, his counsel filed this class action complaint.
B. Tire Kingdom
Tire Kingdom sells tires and provides automotive repair services. The company operates more than 650 stores in eight states and charges a shop fee on certain services. The purpose of the fee is to recover some of the costs of motor vehicle services that cannot be charged individually, such as rags, solvents, cleaners, floor mats, seat covers, steering wheel covers, and minor hardware items. The amount of the fee has varied through the years, but has ranged from six percent to ten percent of the standard retail price of the service up to thirty dollars.
The Florida Motor Vehicle Repair Act requires all written estimates for repair work on a motor vehicle, the cost of which will exceed $100, to disclose the anticipated amount of any charge levied as a shop fee or hazardous waste removal fee together with the explanation, “This charge represents the costs and profits to the motor vehicle repair facility for miscellaneous shop supplies or waste disposal.” § 559.905(l)(h), Fla. Stat. (2006). Tire Kingdom requires every repair service customer to sign an estimate prior to service, even when the cost of the service is expected to fall below $100. For those services where Tire Kingdom charges a shop fee or hazardous waste disposal fee, the fee is computer calculated and included on both the estimate and invoice form. The statutorily required explanation is pre-printed on both forms and thus appears on the form whether or not such a fee will be charged to the customer. Each store also posts signs in its customer service area to inform Tire Kingdom customers about these charges.
Tire Kingdom markets its services in all media, including radio, television, print media, direct mail, and the internet. The company regularly includes discount coupons for its services in its print media, direct mail, and internet advertising. It began including discount coupons in its internet advertising, prominently including its own website, in February 2006. For all services for which Tire Kingdom charges a shop fee or hazardous waste disposal fee, it is Tire Kingdom’s policy to disclose that fact in both its advertisement and within any coupon included in the advertisement. Exemplar coupons in the record indicate the company places the disclosure near the advertised price for the service. However, the language of the disclosures employed by Tire Kingdom on its coupons and in its advertisements does not appear to be uniform. For example, one of the record exemplars includes the language, “Plus Shop Fee” adjacent to the advertised price. Another states, “Plus Shop Fee at 10%” at a similar location on that particular coupon.
It is the responsibility of Robert Crosta-rosa, Tire Kingdom’s Vice President of Marketing, to assure that Tire Kingdom’s print and internet advertising conforms to its company disclosure policy and that each state’s disclosure rules and regulations are met as well. Although he has no formal training in advertising, or advertising regulation, including the laws and rules of the various states, he does have some *444 thirty years of experience in the retail tire and repair service industry, including stints with several of Tire Kingdom’s competitors where his responsibilities included advertising and marketing.
Although Tire Kingdom disputes the legal effect of the testimony, Crostarosa is of the view it is misleading to the consumer not to disclose fees, like a shop fee, in coupon advertisements. He reaches this conclusion based upon his common sense understanding, consistent with company policy, that the full price of any advertised service, excluding sales taxes, should be disclosed in company promotional materials disseminated to the public. He admits that Tire Kingdom occasionally has failed to include this disclosure in an advertisement or discount coupon. However, he believes the non-disclosure errors have been few in the print media and less than ten percent of internet postings. Tire Kingdom has available copies of its advertisements that have run in print, direct mail, or over the internet going back to 2003.
Tire Kingdom store managers and salespersons exercise wide berth in the grant of discounts and price adjustments on Tire Kingdom services. For example, while store managers are instructed to require the production of a coupon at the time of service to receive a coupon discount, the rule is honored as much in the breach as in the observance at Tire Kingdom. “Coupon discounts” regularly are afforded: to a customer who merely asks for or demands the “lowest [available] price” at the customer counter; a customer who states she came to the store because she saw, heard about, or had a coupon but did not have it in hand; to price an “add-on” when a mechanic sees a need while servicing a vehicle; to meet a competitor’s price; to reward customer loyalty or satisfaction; or simply because the salesperson knows there is a lower price than the standard retail price and elects to offer it.[9] Although senior management might prefer that store managers and salespersons act with greater discipline in these regards, the business culture at Tire Kingdom is to afford store managers and salespersons a “free range on pricing” with the goal, as store manager Alvarez testified, to do whatever is necessary to “keep the customer” and “keep the customer happy.”
Perhaps as a corollary, the accounting for coupon use throughout Tire Kingdom is desultory at best. All Tire Kingdom discount coupons are imprinted with a code so Tire Kingdom can monitor the effectiveness of its advertising. However, just as the requirement imposed on store managers and salespersons to receive a coupon before giving a discount is honored as much in the breach as in the observance, so also are the in-store coupon recording and coupon accounting practices across Tire Kingdom. According to Eduardo Alvarez, his Coral Gables store uses a “generic code” to record every discount or price adjustment made by the store. Tire Kingdom has found that strict adherence to customer discount, price adjustment, and coupon account requirements to be “impossible of enforcement” in the milieu in which it operates.
ANALYSIS
Class certification is a serious decision, often the defining moment in a lawsuit (for it may sound the “death knell” of litigation on the part of plaintiffs, or create unwarranted pressure to settle non-meritorious *445 claims on the part of defendants). A grant of certification considerably expands the dimensions of the lawsuit, and commits the court and parties to much additional labor over and above that entailed in an ordinary private lawsuit. It is thus often stated that a class action may be certified only after the trial court determines, on the basis of a rigorous analysis, the elements of the class action rule have been satisfied. See Miami Auto. Retail, Inc. v. Baldwin, — So.3d -, 2011 WL 2496609 (Fla. 3d DCA 2011); Baptist Hosp. of Miami v. Demario, 661 So.2d 319, 321 (Fla. 3d DCA 1995) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).[10]
Parties seeking class certification have the burden of pleading and proving each and every element required by Florida Rule of Civil Procedure 1.220. Terry L. Braun, P.A. v. Campbell, 827 So.2d 261, 265 (Fla. 5th DCA 2002). The rule contains four threshold requirements applicable to all class actions:
(1) the members of the class are so numerous that separate joinder of each member is impracticable [numerosity], (2) the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class [commonality], (3) the claim or defense of the representative party is typical of the claim or defense of each member of the class [typicality], and (4) the representative party can fairly and adequately protect and represent the interests of each member of the class [adequacy],
Fla. R. Civ. P. 1.220(a). In addition to satisfying these requirements, a party seeking class certification also must satisfy one of the three subdivisions of Florida Rule of Civil Procedure 1.220(b). Tire Kingdom does not challenge the numerosity element of the class certification rule in this ease. Accordingly, we limit our discussion to the commonality, typicality, and adequacy elements of the rule. Because we conclude the plaintiffs presented insufficient evidence to satisfy two of the three challenged subsection (a) requirements— commonality and typicality—it is unnecessary for us to consider any of the subsection (b) requirements.[11] We treat the elements necessary to our decision in this case in turn.
COMMONALITY
The primary concern on this element is “whether the representative members’ claims arise from the same practice or course of conduct that gave rise to the other claims, and whether the claims are based on the same legal theory.” Powell, 522 So.2d at 70; see also Olen Props. Corp. v. Moss, 981 So.2d 515, 520 (Fla. 4th DCA 2008); Braun, 827 So.2d at 267.
*446 As we interpret the order under review, the trial court was of the impression that “Tire Kingdom repeatedly and with only non-material variations published the same advertisements across Miami-Dade County and the State of Florida,” such that the members of the class “were all victims of overcharges by the Defendant either through the omission of the shop fee in the advertisements or being charged a shop fee based on the retail price.” With these postulates in mind, the trial court summarized the “common issues” justifying class treatment of the case as follows:
a. Whether Defendant’s representations, omissions, and conduct regarding its coupons and/or advertisements were misleading or false as to any material fact;
b. Whether Defendant’s representations and conduct were likely to deceive consumers as to the complete purchase price;
c. Whether Defendant violated Miami-Dade Ordinances and/or Florida Law;
d. Whether Defendant made false promises of a character likely to influence, persuade, or induce customers to authorize the service;
e. Whether the Defendant advertised and represented repair work when there was a material contingency, condition or limitation on the offer, without such contingency, condition, or limitation being stated contemporaneously with the offer in a manner clearly and easily understood by the customer;
g. Whether Defendant initiated a deceptive marketing campaign;
h. Whether Defendant used or employed unconscionable commercial practices in its advertisement of its motor vehicle services;
i. Whether the members of Classes have been injured by Defendant’s conduct;
j. Whether the members of Classes have sustained damages and are entitled to restitution as a result of Defendant’s wrongdoing and, if so, what is the proper measure and appropriate formula to be applied in determining such damages and restitution.
(emphasis added).
The errors in this analysis are several. First, not only are the trial court’s impressions not supported by the record, but also they constitute improper incursion by the trial court into the merits of the case. Controlling precedent makes clear that a trial court considering whether an action may be maintained is not to focus on the merits of the case, but only on the requirements of the rule, see Ameriquest Mortg. Co. v. Scheb, 995 So.2d 573, 574 (Fla. 2d DCA 2008) (Altenbernd, J. concurring); City of Tampa v. Addison, 979 So.2d 246, 252 (Fla. 2d DCA 2007); Samples v. Hernando Taxpayers Ass’n, 682 So.2d 184, 185 (Fla. 5th DCA 1996); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (“We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.”), lest the cold neutrality of the trial judge expected in these important decisions be placed in jeopardy. The trial court crossed that line in this case by reaching its own preliminary conclusions on the merits of the case at the class action stage of the litigation. This alone is a sufficient ground upon which to reverse the class determination.
*447 Second, a casual perusal of the “common issues” found by the court to justify class treatment of this case — whether “[defendant's representations ... were misleading,” “likely to deceive,” “violated Miami-Dade Ordinances and/or Florida Law,” or “[djefendant initiated a deceptive marketing campaign,” and “[wjhether the members of the class have been injured ... or sustained damages,” — while couched in soothing legal lexicon, are all questions that will be decided by an ultimate fact finder, in this case a jury. An incantation of ultimate legal issues, however variously and creatively they might be couched, does not suffice to meet the commonality element of our class action rule. See Wal-Mart Stores, Inc. v. Dukes, — U.S. -, -, 131 S.Ct. 2541, 180 L.Ed.2d 374, 2011 WL 2437013, at *7 (2011) (“ ‘What matters to class certification ... is not the raising of common ‘questions’ — even in droves— but, rather the capacity of a class[-]wide proceeding to generate common answers apt to drive the resolution of litigation.’ ”) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.Rev. 97, 132 (2009)) (emphasis in WaV-Mart Stores ).[12]
Third, while it frequently is said that the threshold for commonality is not high, see Morgan v. Coats, 33 So.3d 59, 64 (Fla. 2d DCA 2010), satisfaction of this element of class certification entails proof of a “common right of recovery based upon the same essential facts.” State Farm, Mut. Aiito. Ins. Co. v. Kendrick, 822 So.2d 516, 517 (Fla. 3d DCA 2002). On this point, it is important to remember the class as proposed by the plaintiffs and certified by the trial court includes not only Tire Kingdom customers who brought an allegedly defective coupon to a Tire Kingdom store, but also all customers who “benefited” from such a coupon. To capture the class, Plaintiffs first propose to identify those purchasers who used a coupon which failed to disclose a shop fee by consulting Tire Kingdom’s coupon archive to determine the coupon codes of those advertisements that omitted reference to a shop fee and then cross-check that data against Tire Kingdom’s electronically stored invoices.[13] Plaintiffs then propose to add to that group all individuals who received a discount on their service and who were charged a shop fee based upon the retail price of the service rather than the dis *448 counted service price. The former group would receive a computer-calculated full refund of the shop fee charged. The latter group would receive a computer-calculated refund of any amount charged as a shop fee in excess of ten percent of the discounted price of the service, based upon a separate computerized review of Tire Kingdom’s electronically stored service invoices. Remarkably, all Tire Kingdom customers who received a discount — either through use of a coupon or otherwise — at a Tire Kingdom store and who were charged a shop fee, would be eligible to receive a refund of all or at least part of the shop fee paid. Plaintiffs’ legal justification for compensating the latter group, or “subclass” as characterized by them, is that these consumers were misled as a matter of law.[14]
This, of course, flies in the face of a properly pled and proven consumer claim for damages under FDUTPA. Such a claim requires proof of: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages, see Rollins, Inc. v. But-land, 951 So.2d 860, 869 (Fla. 2d DCA 2006). For the class as certified, individualized proof would be required. The plaintiffs argue to the contrary, based upon our decision in Latman v. Costa Cruise Lines, N.V., 758 So.2d 699, 703 (Fla. 3d DCA 2000). In Latman, a class of cruise passengers sued several cruise lines for deceptively labeling a fee on their invoices as a “port charge” when, in reality, it was largely a hidden mark-up to the cruise price. In some cases, cruise passengers were given a separate breakdown for the cruise charge and the port charges, while others were given only the total cruise price. In every instance, the consumer knew at the outset the total price of the cruise and could make a decision whether the total price was acceptable. In opposing class certification, the cruise lines argued that because the total price was disclosed in advance of the purchase, only those consumers who “were influenced in some way by the port charges,” could claim to have been harmed, and “whether there was individual reliance and resulting damage in any individual case must ... necessarily be a case-by-case inquiry.” Id. at 702-03. Relying upon comparable authority from other jurisdictions as well as cases decided by the courts of this state, “[w]e held that members of a class proceeding under [FDUTPA] need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations.” Id. at 703. We approved the certified class because each and every class member “parted with money for what should have been a ‘pass through’ port charge, but the cruise line kept the money.” Id.
We find Latman inapplicable. A very different case is presented where, as here, the plaintiffs do not rest on undisputed documentary evidence. See, e.g., Pop’s Pancakes, Inc. v. NuCO2, Inc., 251 F.R.D. 677, 688 (S.D.Fla.2008) (concluding Latman inapplicable to dispute over *449 property-tax charges in lease because written documents were not dispositive of claim). In stark contrast, the plaintiffs here claim each class member “pa[id] more than was bargained for.” To make this determination, it follows that each class member’s Tire Kingdom experience — including the precise language of each advertisement, the class member’s awareness of Tire Kingdom’s shop-fee signage, and the class member’s conversations with Tire Kingdom employees— would have to be explored to determine Tire Kingdom’s liability to each class member. Latman represents the rare exception to the general rule that collective proof of individualized transactions cannot be used to prove the indispensable element of causation in a FDUTPA class action. See Rollins, Inc., 951 So.2d at 873-75.
Plaintiffs simply cannot evade the decision in Egwuatu v. South Lubes, Inc., 976 So.2d 50 (Fla. 1st DCA 2008), in which the trial court applied the principles on which Tire Kingdom relies to a similar FDUTPA scenario. In Egwuatu, the defendant, Jiffy Lube, “offered a service known as the ‘Signature Service Oil Change’ for an advertised price of $27.99 plus an environmental fee, which was added in varying amounts in a range of $1.00 to $2.50 per vehicle.” Id. at 51. The plaintiff alleged the assessment of the fee was a deceptive trade practice, in that it appeared to be a tax the company was collecting from consumers. The trial court denied the plaintiffs motion for class certification on the ground there were individualized differences among the potential plaintiffs as to whether they paid the fee or knew the fee was not a tax. Id. at 51-52. The First District Court of Appeal affirmed, stating:
In the present case, the trial court concluded that class litigation would be impractical because there would be many differences in the facts supporting the claims of the individual plaintiffs. This conclusion was based on the fact that the defendants have employed a variety of methods over the years to inform customers that the environmental fee was not a tax. For example, they posted menu boards stating that the environmental fee was added for the handling of hazardous products; they gave verbal explanations of the fee to customers who asked about it; they posted in all of their stores a letter from defendant Huntley explaining the fee; and they posted a fee notice explaining the environmental fee on written estimates exceeding $100. In these circumstances, the trial court reasoned that it would be necessary to make a number of individual inquiries to determine which potential class members had actual knowledge that the fee was not a tax.
Additionally, the trial court noted that some of the defendants’ commercial customers did not use the defendants’ service exclusively but that they also did business with other oil change companies. These customers must have known that the environmental fee the defendants charged was not a tax, because the other oil change companies they were doing business with did not charge it. Hence, the court concluded that an individualized inquiry would be required to determine the facts of each of the commercial customer’s experience with the defendants and whether that customer knew that the fee was not a tax.
Id. at 53-54. The same reasoning pertains here. In fact, James Soper, albeit not a Tire Kingdom commercial customer, did not use Tire Kingdom’s service exclusively, but also did business with at least one other entity that charged a shop fee. See supra note 8.
*450 Plaintiffs attempt to characterize Eg-wuatu as an “outlier” decision and assert that this court should be “bound by its precedent of Latman.” Plaintiffs seek to evade Egwuatu because that decision “involved the review of a denial of a motion for class certification ... where the burden on appeal was the exact reverse of the burden in this case.” But allowing so-called “common proof’ to substitute for individually proving each class member’s unique claim is legal error that cannot hide behind the abuse of discretion standard. See Rollins, Inc., 951 So.2d at 873-75.
In Rollins, the court reversed a class certification because the individualized nature of the FDUTPA claims could not be “papered over” by proof of a “common scheme” or “business practice.” Id. at 873-74. (“[A]uthorizing the class-wide proof to be made based on alleged company-wide pervasive schemes and business practices is not only inconsistent with established Florida precedent, but it also has the potential to deny [class action defendants] substantive due process of law.”); accord Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1138 (Fla. 3d DCA 2008). That holding controls here.
This is not a case where the disputed issues are subject to being addressed on a class-wide basis.
TYPICALITY
Rule 1.220(a)(3) requires the claims of the representative class members to be typical of the claims of the class. This element focuses on the sufficiency of the named plaintiffs, see Kia Motors, 985 So.2d at 1133 n. 3, and the relationship between their claims and the class’s claims, see Kendrick, 822 So.2d at 517. On this element, the trial court concluded the plaintiffs “allege[d] and ... established that their claims and injury are identical to the claims of other class members.” The trial court appears to reach this conclusion based upon the fact the same theories of recovery are alleged to apply to each class member. However, “[mjerely pointing to common issues of law is insufficient to meet the typicality requirement when the facts required to prove the claims are markedly different between class members.” Olen Props., 981 So.2d at 520 (quoting Braun, 827 So.2d at 267). We find that to be the case here. Additionally, the trial court places substantial reliance on its belief Tire Kingdom engaged in “a common scheme” making “class action treatment particularly appropriate” for this ease. The evidence does not support such a conclusion. See Safeway Premium Fin. Co. v. Sosa, 15 So.3d 8 (Fla. 3d DCA 2009), review granted 37 So.3d 849 (Fla. 2010) (reversing class certification where record was devoid of evidence that Safeway’s failure to adjust premium financing agreements for service overcharges was based upon some uniform action by Safeway.).
On this element, it is not sufficient the plaintiff has “some claim.” Our adversary system works well only when “[the] system is confident that the ... litigant who does his best for himself also inescapably benefits his fellow class members.” Degnan, Ronan E., Foreward, Adequacy of Representation in Class Actions, 60 Calif L.Rev. 705, 716 (1972). When, as in this case, the factual basis of the claims asserted by the plaintiffs do not have the same basic structure as those of the certified class, the representation that might be given to the few will not be found to be adequate for those that differ significantly. Id. The plaintiffs in this case have failed in their obligation to demonstrate their sufficiency to maintain this action as a class action;
ADEQUACY
Rule 1.220(a)(4) requires the class representatives to demonstrate if the *451 representative parties “can fairly and adequately protect and represent the interests of each member of the class.” The difference between this element and the typicality requirement is not crystal clear. Massengill v. Bd. of Ed., Antioch Cmty. High Sch., 88 F.R.D. 181, 186 (N.D.Ill., E.D.1980). However, typicality does not guarantee adequate representation. Two grounds frequently employed to determine adequacy of representation are the skill of the attorney to prosecute the case, see Browning v. Angelfish Swim Sch., Inc., 1 So.3d 355, 360-64 (Fla. 3d DCA 2009) (Shepherd, J., concurring in part, and dissenting in part), and lack of conflict between the interests of the representatives and those of the class they seek to represent. See Braun, 827 So.2d at 268 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624-26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In addition, inherent in this rule is “an expectation of a ‘minimal level of interest in the action.’ ” Massengill, 88 F.R.D. at 186 (quoting Sullivan v. Chase Inv. Servs., 79 F.R.D. 246, 258 (N.D.Cal.1978)).
We agree with the trial court that the plaintiffs presented sufficient evidence to satisfy this element. The record reflects the plaintiffs in this case have no direct conflict with any other members of the class, are represented by competent counsel, and appear to have maintained a minimal level of interest in the action.
CONCLUSION
The touchstone of class certification, dating to the origins of the device, see 7A Wright and Miller & Kane, Federal Practice & Procedure § 1751 (2005), is that the class representatives, by proving their own individual cases, necessarily will prove the cases for each one of the thousands of other members who may be members of the class. Kia Motors, 985 So.2d at 1136. By way of contrast, in complex cases, such as this, where no one set of operative facts establishes liability, where no single proximate cause applies to each defendant, and where individual issues outnumber common issues, trial courts should be hesitant to certify class actions. See id. at 1141.
We reverse the order on appeal and remand with directions to the trial court to decertify the class.

. The class definitions are identical, except as to geographic scope:
Any and all residents of [Florida][Miami Dade County] who were overcharged for a service at Tire ¡Kingdom by Tire Kingdom's inclusion of a shop fee when such shop fee was not disclosed in the advertisement that plaintiff used or benefited from; by Tire Kingdom's imposition of a shop fee based upon a percentage of the retail price of the service, rather than the advertised or charged price; or by both.

. For this reason, we discuss the law of FDUTPA but intend its principles to apply as well to the similar private rights of action afforded by the Florida Motor Vehicle Repair Act and the Miami Dade Vehicle Repair Ordinance. See § 559.921, Fla. Stat. (2006); § 8A-161.21, Miami Dade County Code.

. Soper previously participated as a named plaintiff in a class action involving energy surcharges against Wyndham International, also brought by plaintiffs' counsel.

. Although class action hearings are eviden-tiary in nature, the parties elected to submit the class determination to the trial court based solely upon affidavits, depositions, and the circuit court record.

.This language is prescribed by section 559.905(h) of the Florida Motor Vehicle Repair Act, to be included on all estimates for which the cost of the repair work will exceed $100. The language was pre-printed at the foot of all estimate and invoice forms utilized by Tire Kingdom during the period relevant to this proposed class action. See infra pp. 10-11.

. Soper testified as follows in his deposition:
Q. I asked you earlier whether you had signed anything before you had the service performed, and you said you were not sure. Does this [Exhibit D, the estimate] refresh your recollection?
A. I'm not sure. I believe it was signed afterward, but I'm not sure. When I was checking out.

. Section 559.905(2), Florida Statutes (2006), directs that if the repair cost:
will exceed $100, the repair shop shall present to the customer a written notice conspicuously disclosing, in a separate, blocked section, only the following statement, in capital letters of at least twelve-point type:
PLEASE READ CAREFULLY, CHECK ONE OF THE STATEMENTS BELOW, AND SIGN:
I UNDERSTAND THAT, UNDER STATE LAW, I AM ENTITLED TO A WRITTEN ESTIMATE IF MY FINAL BILL WILL EXCEED $100.
_ I REQUEST A WRITTEN ESTIMATE.
_ I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $_THE SHOP MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.
_ I DO NOT REQUEST A WRITTEN ESTIMATE.
SIGNED_DATE_

. Repair invoices produced by Soper reflect that most maintenance and repair work done on his vehicle was performed by Land Rover Fort Lauderdale, the dealer from which he purchased the vehicle new in 2002. These invoices indicate Soper was charged and paid a shop fee to Land Rover Fort Lauderdale on at least two occasions before patronizing Tire Kingdom on March 27, 2007. Like Tire Kingdom, Land Rover Fort Lauderdale’s invoice forms carry this statutorily prescribed language. See supra note 5.

. Store managers have no such discretion to discount or forgive shop fees or hazardous waste fees.

. Florida Rule of Civil Procedure 1.220 was completely revised in 1980 to bring it in line with modem practice and is based upon Federal Rule of Civil Procedure 23. See The Fla. Bar, 391 So.2d 165, 170 (Fla.1980). We follow the federal construction and application by analogy where appropriate. See Powell v. River Ranch Prop. Owners Ass'n, 522 So.2d 69, 70 (Fla. 2d DCA 1988).

. The relevant subdivision of subsection (b) applicable to this case is subdivision (b)(3), requiring that the common questions must predominate over any questions affecting only individual members, and that the class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. Since the predominance requirement of subsection (b)(3) is obviously more stringent than that prescribed by subdivision (a)(2), a proposed class which fails to meet this element necessarily fails to meet requirements of Florida Rule of Civil Procedure 1.220(b)(3). See 7A Wright, Miller & Kane, Federal Practice & Procedure § 1763 (2005).

. The "evidence of commonality” advanced by the en banc majority of the United States Court of Appeals for the Ninth Circuit in Wal-Mart Stores as being “sufficient to " ‘raise [a] common question [was] whether Wal-Mart's female employees nationwide were subjected to a single set of corporate policies ... that may have worked to unlawfully discriminate against them in violation of Title VII.' " Wal-Mart Stores, Inc., — U.S. -, -, 131 S.Ct. 2541, 180 L.Ed.2d 374, 2011 WL 2437013, at *6 (quoting Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 612 (9th Cir.2010)), judgment reversed by Wal-Mart, — U.S. -, -, 131 S.Ct. 2541, 180 L.Ed.2d 374, 2011 WL 2437013, at *16. Rejecting the use of such conclusory statements to satisfy the commonality requirement of Federal Rule of Civil Procedure 23(a)(2), Justice Scalia wrote, "[Commonality] does not mean merely that [the proposed class] have all suffered a violation of the same pro-vision of law.” Wal-Mart, -U.S. -, -, 131 S.Ct. 2541, 180 L.Ed.2d 374, 2011 WL 2437013, at *7. Rather, "[satisfaction of the commonality element] requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' ” Id. (citing Falcon, 457 U.S. at 157, 102 S.Ct. 2364). The purported "common questions” in this case are indistinguishable in kind from the common question rejected as insufficient by the United States Supreme Court in Wal-Mart.

. The "benefited” purchasers, described by counsel for appellees in their brief as "people who went to Tire Kingdom and ... requested a discount based upon having seen a coupon containing no reference to a shop fee, but were charged a shop fee anyway.”

. A few days prior to entering its order certifying the classes in this case, the trial court granted partial summary judgment to the plaintiffs on the FDUPTA, Florida Motor Vehicle Repair Act, and Miami-Dade County Vehicle Repair Ordinance counts of the complaint, the same counts which the trial court then certified for class treatment, stating, inter alia, "Tire Kingdom’s advertisements, both those that omitted mention of a shop fee and those that failed to disclose the shop fee was charged on the retail price, were untrue, deceptive and misleading.” Even if summary judgment was properly granted on this basis, that fact does not pretermit our decision today reversing the class certification decision. As next explained, proof of a deceptive act or unfair practice is but one element of proof required for recovery by the plaintiffs in this case.